Filed 8/11/26  Comite Civico Del Valle v. County of Imperial CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| COMITE CIVICO DEL VALLE et al., | D085747 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. ECU003425) |
| COUNTY OF IMPERIAL et al., | |
| Defendants and Respondents; | |
| CONTROLLED THERMAL RESOURCES (US), INC., et al., | |
| Real Parties in Interest and Respondents. | |

APPEAL from a judgment of the Superior Court of Imperial County, Jeffrey B. Jones, Judge.  Affirmed in part, reversed in part, and remanded with instructions.

Carstens, Black & Minteer, Douglas P. Carstens, Michelle N. Black, Sunjana Supekar; Law Office of Jordan R. Sisson and Jordan R. Sisson, for Plaintiffs and Appellants.

Geoffrey Holbrook, County Counsel, Andrew E. Briseno, Deputy County Counsel; Remy Moose Manley, Nathan O. George and Chrstina L. Berglund for Defendants and Respondents.

Environmental Law Group, Varco & Rosenbaum, Suzanne R. Varco and Grant Olsson for Real Parties in Interest and Respondents.

## I.   INTRODUCTION

The Imperial Valley:  "Its fruitful soil was caressed by the wasting water of an unregarded river and blossomed in perennial beauty[.]"[1]

Water from the Colorado River is the sole source of fresh water for the County of Imperial (County) and in particular, for agriculture in the Imperial Valley.  That water supply is not unlimited, and the available water is critical in one way or another to everyone who lives or works in the County.  Any project that requires substantial water must be considered with great care to ensure that the County's residents, businesses, and environment are not adversely affected by its planned water use.

This appeal involves the County's approval of a geothermal power plant, a lithium extraction facility, and related facilities (together, the Project) near the Salton Sea as well as the certification of an environmental impact report (EIR) for the Project under the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.).[2]  Comite Civico del Valle and Earthworks (together, Appellants) filed a petition for writ of

---

[1]    Farr, The History of Imperial County California (1918).

[2]    Further section references are to the Public Resources Code unless noted.

2

mandate against the County and the Project's developers, Controlled Thermal Resources (US), Inc., Hell's Kitchen PowerCo 1, LLC, and Hell's Kitchen LithiumCo 1, LLC (collectively, CTR).[3] The superior court entered a judgment denying the petition.

On appeal, Appellants challenge the certification and approval of the Project on various grounds. In particular, they argue insufficient evidence supports the County's conclusion that the Imperial Irrigation District (IID)[4] can provide adequate water supplies to the Project for the 50-year lifespan of the Project. They further argue that the EIR contains an inadequate discussion of water supply mitigation measures under CEQA law. They also contend the EIR omits necessary cumulative impacts and air impacts analyses. Finally, they argue that the County failed to engage in timely and meaningful tribal consultation to identify and mitigate impacts on tribal cultural resources.

We agree that the administrative record does not contain sufficient evidence to demonstrate that the IID can supply water to the Project for 50 years. We also agree that the EIR failed to adequately discuss mitigation measures targeted at possible future mandated water supply reductions from the Colorado River. Additionally, we conclude that the IID's concerns about the impact of the Project's water use on air quality were not speculative and therefore the EIR should have addressed that impact. However, we agree with Respondents that the County's tribal consultations were adequate.

---

[3]    Because the County and CTR filed jointly, we refer to them collectively as Respondents.

[4]    The IID delivers Colorado River water via canals to numerous cities and hundreds of thousands of acres of agricultural lands in the Imperial Valley. It also operates an extensive lateral drainage system that drains agricultural runoff. This drainage eventually flows into the Salton Sea.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A. The Project

The Project is located approximately 3.6 miles west of the town of Niland in Imperial County and is surrounded on three sides by agricultural or vacant land.  The Salton Sea is on the Project's western border.

CTR applied for approval to build the Project, which consists of (1) a geothermal power plant that will produce up to 49.9 megawatts of geothermal green energy (Hell's Kitchen PowerCo 1 or HKP1), (2) mineral extraction and processing facilities (Hell's Kitchen LithiumCo 1 or HKL1), and (3) facilities for the administration, repair, and shipping needs of the Project.  More specifically, the Project will use wells to bring up hot geothermal brine lying beneath the Salton Sea.  Steam from the brine will be used to generate geothermal energy at the HKP1 power plant, while the HKL1 plant will extract lithium hydroxide, silica, polymetallic products, and possibly boron compounds from the brine.  HKL1 will sell the extracts.  The geothermal brine will then be injected back into the geothermal reservoir.

The Project will require approximately 6,500 acre-feet per year (AFY) of raw water, supplied by IID, to operate.

### B. The County's Review and Approval of the Project

Imperial County Planning and Development Services was the lead agency on the Project.  The County released a notice of preparation (NOP) of draft EIR (draft EIR or DEIR) in late March 2022.  It released the DEIR as well as a draft water supply assessment (WSA), dated June 2023, for public review on September 8, 2023, and accepted public comments until November 30, 2023.  Appellants, the California State Lands Commission, and IID, among others, submitted letters raising numerous issues during the public comment period.  The County prepared a revised WSA, which was dated

4

November 2023, and issued both a revised DEIR and the final EIR (final EIR or FEIR) in December 2023.[5]

On December 13, 2023, the County's Planning Commission held a public hearing and then approved the Project. Appellant Comite Civico del Valle appealed to the County Board of Supervisors.

Meanwhile, IID sent an email to the County's senior planner on December 7, 2023, indicating that an attached WSA (dated December 2023) (final WSA), which incorporated IID's technical findings, was "acceptable for incorporation into the Final EIR as part of the CEQA process, pending lead agency action for SB 610 compliance."[6] The email went on to state that "[t]hese technical findings are solely related to water supply and do not represent IID's opinion of FEIR adequacy, particularly as it relates to assessment of potential impacts to IID facilities and/or consistency with any existing contractual requirements." Unfortunately, although this letter

---

[5]    Although the FEIR indicates that it incorporates the revised DEIR, we refer to these documents separately for clarity. We refer to the certified EIR as simply the "EIR."

[6]    "SB 610" refers to Senate Bill No. 610, which amended Water Code section 10910 et seq. and focused on "strengthening urban water management plans as well as the connection between water supply assessment and the plans (or the equivalent level of analysis if there is no plan)." (*California Water Impact Network v. Newhall County Water Dist.* (2008) 161 Cal.App.4th 1464, 1479–1480 (*California Water Impact Network*).) "[SB] 610 was motivated by a concern that certain counties and cities were either ignoring or inadequately considering water supply issues prior to approving new developments." (*Id.* at p. 1486.) Although "the Legislature wanted to ensure that lead agencies thoroughly considered water supply issues and wanted to add transparency to the entire process, the Legislature committed the final determination on water supply issues to the lead agency, not the water providers." (*Ibid.*)

predated the planning commission's public meeting, it appears the planning commission reviewed and approved the November WSA, not this revised December version.  Notably, in its response to Appellants' appeal to the board of supervisors, CTR explained that the final version of the WSA (seemingly referring to the one dated December 2023) included "minor revisions" from the November 2023 one initially included in the FEIR, including "a calculation of the total water demand for the Project to reflect a 30-year water demand."

On January 11, 2024, the County requested that the board of supervisors schedule a public hearing to consider the appeal.  It provided to the board the final WSA and the FEIR.  At some point thereafter, the County submitted a revised mitigation monitoring and reporting program document with revisions to mitigation measure UTIL-1, which relates to water availability for the Project.  The board of supervisors held a hearing on January 23, 2024, denied the appeal, and approved the Project.  The County filed a notice of determination on January 24, 2024.

**C. Writ of Mandate and Trial Court Proceedings**

Appellants filed a petition for writ of mandate on March 13, 2024, challenging the County's approval of the Project and certification of the EIR.  The superior court heard oral argument and then asked the parties to file supplemental briefs identifying the principal controverted issues.  Following the supplemental briefing, the court denied the petition.

### III.   DISCUSSION

**A. Legal Principles**

**1.  General Overview of CEQA**

CEQA "and the regulations implementing it (Cal. Code Regs., tit. 14, § 15000 et seq.) embody California's strong public policy of protecting the environment."  (*Tomlinson v. County of Alameda* (2012) 54 Cal.4th 281, 285–

6

286, quoting Cal. Code Regs., tit. 14, § 15002; hereafter Guidelines.[7]) "CEQA was enacted to advance four related purposes:  to (1) inform the government and public about a proposed activity's potential environmental impacts; (2) identify ways to reduce, or avoid, environmental damage; (3) prevent environmental damage by requiring project changes via alternatives or mitigation measures when feasible; and (4) disclose to the public the rationale for governmental approval of a project that may significantly impact the environment." (*California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 382 (*Building Industry*).)  "CEQA was intended to be interpreted in such a manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." (Guidelines, § 15003, subd. (f).)

"[I]f the agency finds the project 'may have a significant effect on the environment,' it must prepare an EIR before approving the project." (*Building Industry, supra*, 62 Cal.4th at p. 382, citing §§ 21100, subd. (a), 21151, subd. (a), 21080, subd. (d), 21082.2, subd. (d).)  An EIR "must include a description of the proposed project and its environmental setting and discussions of (1) the possible environmental effects of the project, (2) feasible measures to mitigate any significant, adverse environmental effects of the project, (3) the comparative environmental effects of a range of reasonable alternatives to the proposed project, including a 'no project' alternative, and (4) the cumulative impact of the project's various environmental effects." (*County of Butte v. Department of Water Resources* (2022) 13 Cal.5th 612, 627 (*County of Butte*), citing Guidelines, §§ 15124, 15126, 15126.4, 15126.6,

---

7    We use "Guidelines" to refer to the Guidelines for Implementation of the California Environmental Quality Act (Cal. Code Regs., tit. 14, § 15000 et seq.).

15130.) "An EIR may also include a discussion of the economic and social effects of the project." (*Ibid.*) "CEQA does not require technical perfection in an EIR, but rather adequacy, completeness, and a good-faith effort at full disclosure." (Guidelines, § 15003, subd. (i).)

## 2. Standard of Review in a CEQA Case

The appellate court's review in a CEQA case is the same as the trial court's review. (*Protecting Our Water & Environmental Resources v. County of Stanislaus* (2020) 10 Cal.5th 479, 495.) The court's inquiry in reviewing an agency's compliance with CEQA "shall extend only to whether there was a prejudicial abuse of discretion" by the agency. (§ 21168.5.) Such an abuse is established "if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (*Ibid.*) "Judicial review of these two types of error differs significantly: While we determine de novo whether the agency has employed the correct procedures, 'scrupulously enforc[ing] all legislatively mandated CEQA requirements' [citation], we accord greater deference to the agency's substantive factual conclusions." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 435 (*Vineyard*).) "In reviewing for substantial evidence, the reviewing court 'may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable,' for, on factual questions, our task 'is not to weigh conflicting evidence and determine who has the better argument.'" (*Ibid.*) Ultimately, "[a] prejudicial abuse of discretion occurs if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process." (*Kings County Farm Bureau v. City of Hanford* (1990) 221 Cal.App.3d 692, 712.)

## B. Adequacy of the Water Supply for the Project

### 1. Appellants' Contentions

Appellants challenge the EIR's assertions that the Project will have an adequate supply of water on several grounds.

First, they contend the EIR offers conflicting information as to whether the Project's anticipated lifespan is 30 or 50 years and that it is uninformative to the extent it claims sufficient water will be available for a 50-year lifespan. Respondents object that Appellants did not exhaust this argument by raising it during the County's administrative process.[8] That may be true, in that Appellants did not exhaust the legal argument that

---

[8] Respondents also contend Appellants waived their argument about variations in the Project's lifespan by failing to raise it at trial. While failure to present an issue to the trial court generally forfeits consideration of that issue on appeal (see *Howitson v. Evans Hotels, LLC* (2022) 81 Cal.App.5th 475, 489), Respondents have not persuaded us this principle applies in a CEQA case. In a CEQA case, "[t]he appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo." (*Vineyard, supra*, 40 Cal.4th at p. 427.) Respondents primarily rely on *A Local & Regional Monitor v. City of Los Angeles* (1993) 12 Cal.App.4th 1773 (*ALARM*), but in that case, the court determined the appellant was barred from raising a claim for the first time on appeal because it failed to exhaust its administrative remedies. (*Id.* at p. 1804.) Forfeiture was only cited as an additional reason, and the court did not explain how this principle applied to CEQA review. (*Ibid.*) The same is true of the other cases cited by Respondent. (See *El Morro Community Assn. v. California Dept. of Parks & Recreation* (2004) 122 Cal.App.4th 1341, 1351 [citing without analysis to *ALARM*]; *Porterville Citizens for Responsible Hillside Development v. City of Porterville* (2007) 157 Cal.App.4th 885, 912 [no analysis within CEQA context when finding forfeiture based on party's failure to bring deficiencies or omissions in the tentative decision to the trial court's attention]; *Old East Davis Neighborhood Assn. v. City of Davis* (2021) 73 Cal.App.5th 895, 912–913 [citing *Porterville*].) Accordingly, we decline to find Appellants forfeited this or any other arguments asserted on appeal by failing to raise them before the trial court or to object when the tentative decision did not address an issue.

9

Respondents failed to proceed in a manner required by law by providing misleading and inconsistent project lifespan information. (See *Covington v. Great Basin Unified Air Pollution Control Dist.* (2019) 43 Cal.App.5th 867, 873 (*Covington*); § 21177, subds. (a) & (b).) But IID did assert below that Respondents had not provided sufficient evidence of the Project's water supply impacts. Thus, this argument was exhausted,[9] and the actual Project lifespan remains highly relevant to our review of the sufficiency of the evidence in support of the County's certification of the EIR.

The Project's lifespan is described inconsistently throughout the record. For example, although the EIR and its supporting documents repeatedly refer to the Project as having a 30-year lifespan and a total water usage based on that duration, they also include references to a 50-year lifespan and assert a different total water usage amount. Table ES-1 of the FEIR, which includes a "[s]ummary of [s]ignificant [i]mpacts and [m]itigation [m]easures," twice refers to it as a 30-year project; the Findings of Fact mention a 30-year lifespan three times; and the Mitigation Monitoring and Reporting Program document references it once. The final WSA states that it examines the "[e]xpected 30-year water demands of the Project," and the table projecting total operational water use, which had originally reflected 50 years of operations and total raw water usage of 299,960 AF in the June WSA, was

---

9     A petitioner has exhausted its administrative remedies if *any person* presented the alleged grounds for noncompliance with CEQA and the party filing the CEQA action objected to the project's approval. (*Covington, supra,* 43 Cal.App.5th at p. 873; § 21177, subds. (a) & (b).) Here, Appellants objected to the Project on many grounds at all administrative levels, and IID specifically addressed the lack of sufficient evidence for the DEIR's contention that adequate water was available to support the Project's 50-year lifespan. Furthermore, we conclude IID stated its objections with sufficient specificity to allow the agency to evaluate and respond to them. (See *Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 535–536.)

revised in the final WSA to reflect 30 years of operations and "an estimated total operational water demand [ ]of 6,500 AFY or 195,000 AF amortized over a 30 year term." None of these final documents indicate the Project proponents expected it to last for 50 years. Further, CTR informed the board of supervisors that the final WSA included "a calculation of the total water demand for the Project to reflect a 30-year water demand."

However, the revised DEIR, which Respondents indicate is part of the certified EIR, muddles the discussion of the Project's lifespan. Although the section of the FEIR entitled "Draft EIR Revisions" does not reflect that the Project lifespan or anticipated water supply needs had changed, the revised DEIR contains multiple references to *both* a 30-year Project life and a 50-year lifespan, including once mentioning them on the same page.

Given the pervasive references to a 30-year Project lifespan in the FEIR, Findings of Fact, Mitigation Monitoring and Reporting Program documents, and final WSA, we cannot agree with Respondents that the 30-year references were mere "scrivener errors." (If anything, the references to a 50-year term in the revised DEIR seem to be the more notable outliers.)

We need not struggle to reconcile the 20-year difference in timeframes scattered throughout the EIR and its drafts. For purposes of our review, we accept the Respondents' assertion in their briefing that the Project's intended lifespan is, in fact, 50 years. Thus, regardless of whether Appellants failed to exhaust their first argument on appeal as to the conflicting statements as to the Project lifespan, our review of Appellants' other contentions requires us to work from an understanding that the approved lifespan for the Project is set at 50 years. As we explain below, evidence in the record that may have supported a 30-year Project lifespan fails to support the longer timeframe.

11

Appellants next argue insufficient evidence supports the County's conclusion that IID can provide adequate water supplies to the Project for its 50-year lifespan. They maintain this is particularly so because Colorado River water allocation laws and persistent drought conditions severely constrain water availability. They further contend that the EIR cannot rely on the availability of water designated by the IID for non-agricultural projects, because the designated Interim Water Supply Policy (IWSP) water supply is not readily available and must first be conserved, contracted for, and purchased before any such water would be available.[10] As we discuss below, we agree the administrative record does not support a finding that 50 years' worth of water is available or likely to become available via conservation efforts.

## 2. Additional Facts

California enjoys senior water rights to Colorado River water, and IID has access to 3.1 million AF of Colorado River water per year. Almost all the Colorado River water is allocated to agricultural use in the Imperial Valley. Leading up to this EIR, IID did not have an adopted urban water management plan in place, and so it adopted the IWSP to address proposed projects while it developed its Integrated Water Resources Management Plan.

---

[10] Contrary to Respondents' assertion, we conclude this argument is exhausted. Once again, although Appellants did not raise this specific issue, IID did, explaining "the IWSP does not dedicate or set aside 25,000 AFY of IID's annual water supply to serve new projects. Refer to prior comments regarding ability to 'conserve' up to 25,000 acre-feet under the IWSP." IID further clarified that the initial draft WSA did not accurately reflect that a portion of this water supply " 'may be contracted for conservation at the discretion of the IID Board.' "

12

Although the IWSP allows IID to reserve up to 25,000 AFY of IID's Colorado River water supply to serve new non-agricultural projects, "[a]s of November 2023, a balance of [only] 18,620 AFY remain[ed] available under the IWSP for new non-agricultural projects."

But to call the remaining balance "available" omits an important point: as discussed below, this supply for non-agricultural projects is not a body of water that merely awaits the IID's directed allocation; it is a hypothetical supply.

The DEIR explained that an April 2023 WSA "evaluate[d] water availability during a normal year, single-dry, and multiple-dry water years for the required 20-year period, plus an additional 30 years for a total of a 50-year water demand for the Project." It estimated the Project would require 299,960 AF of water in total. The DEIR claimed that "[t]he amount of water available and the stability of the IID water supply along with on-farm and system efficiency conservation and other measures being undertaken by IID and its customers ensure that the Project's water needs will be met for the next 50 years."

IID rejected such claims in its November 22, 2023 comment letter,[11] including as to the current availability of water and as to the assertion that sufficient water would be available for 50 years. It began by stating that "[t]he Water Supply Assessment is incomplete and contains inaccurate data." It then explained that "[t]he percentage of project demand to 'IWSP water demand' is not related to an available 'unallocated supply' but rather to an 'unallocated water supply that *may be created and set aside* for new non-

---

[11]    IID's letter references "Appendix M" to the DEIR, which contains a WSA from June 2023, but also notes that the DEIR "incorrectly references a WSA dated April 2023."

agricultural projects.' The project's water supply *needs to be conserved and is not readily available*." (Italics added.) In other words, sufficient water for the Project would have to come from as yet unimplemented conservation efforts. Further, IID admonished that "the analysis must include Best Management Practices that the project incorporates for water conservation and must further address what measures the project plans to take if there is future water supply curtailment of the 6,500 AFY requested."

As to timing, the IID letter explained that "[t]he water supply assessment can't extend beyond 30 years (through 2053) because the Water Supply Assessment template created by IID and Imperial County does not extend beyond 2055. Therefore, there is no 50-year water supply assessment that can be applied to this project. Additionally, the IWSP does not dedicate or set aside 25,000 AFY of IID's annual water supply to serve new projects. Refer to prior comments regarding ability to 'conserve' up to 25,000 acre-feet under the IWSP." It then stated that an entire paragraph of the DEIR related to water supply[12] "need[ed] to be deleted as the statements are all inaccurate." Its reasoning was that "[t]he existing and near-term On-Farm Efficiency conservation and System Efficiency conservation undertaken by IID and its customers under the QSA and other near-term agreements do not ensure that the project's water needs will be met over the next 50 years. Hell's Kitchen, in coordination with IID, will need to implement a

_____

[12]    That paragraph stated: "Project construction represents 2.1 percent of the unallocated supply set aside in the IWSP for nonagricultural projects in the Imperial IRWMP through 2055. Project operations represent 28.2 percent of the unallocated supply set aside in the IWSP for nonagricultural projects in the Imperial IRWMP through 2055. The amount of water available and the stability of the IID water supply along with on-farm and system efficiency conservation and other measures being undertaken by IID and its customers ensure that the Project's water needs will be met for the next 50 years."

14

conservation program or project to generate the 6,500 AFY of water supply that it will need for its operations."

Respondents have not attempted to describe any efforts towards the implementation of a conservation plan or project. Instead, in response to the IID comments, Respondents made revisions to the FEIR and final WSA. The final WSA concluded that IID's projected water supply was sufficient to satisfy the Project's demands "for a 20-year Water Supply Assessment period and for the 30-year proposed Project life." It reflects a reduced estimated total operational water demand of 195,000 AF. It further stated that, "on-farm efficiency conservation measures . . . combined with the conversion of some agricultural land uses to non-agricultural land uses (both solar and municipal), ensure that IID can continue to meet the water delivery demand of its existing and future agricultural and non-agricultural water users, including this Project for the next 20 years and for the life of the proposed Project under a water supply consistent with the district's full entitlement." It acknowledged the Project would be required to mitigate its water demand via conservation programs or projects to receive future water apportionments. And the final WSA acknowledged that CTR would be required to pay a reservation fee and annual water supply development fees to IID to help fund the development of new water conservation, storage, and/or augmentation projects. It also noted that reduced water delivery to IID from the Colorado River was "increasingly likely."

### 3. Legal Principles

Because the Project includes a processing plant, it is an industrial water use project within the meaning of Water Code section 10912 (Wat. Code, § 10912, subd. (a)(5)). An EIR for an industrial processing plant must include analysis of water supply and infrastructure necessary to develop and deliver water to the project. "If the projected water demand associated with

15

the proposed project was accounted for in the most recently adopted urban water management plan, the public water system may incorporate the requested information from the urban water management plan." (Wat. Code, §10910, subd. (c)(2).) If not, "the water supply assessment for the project shall include a discussion with regard to whether the public water system's total projected water supplies available during normal, single dry, and multiple dry water years during a 20-year projection will meet the projected water demand associated with the proposed project, in addition to the public water system's existing and planned future uses, including agricultural and manufacturing uses." (*Id.*, § 10910, subd. (c)(3).) Thus, the WSA was required to discuss available water, including availability during dry water years, for a 20-year period.

Beyond the Water Code's demands, CEQA imposes additional requirements. *Vineyard, supra*, 40 Cal.4th 412 summarizes these principles. "First, CEQA's informational purposes are not satisfied by an EIR that simply ignores or assumes a solution to the problem of supplying water to a proposed land use project. Decision makers must, under the law, be presented with sufficient facts to 'evaluate the pros and cons of supplying the amount of water that the [project] will need.' " (*Id.* at pp. 430–431.) Second, the analysis of water sources for a large land use project and the impacts of exploiting those sources cannot be limited to the water supply for the first few years. (*Id.* at p. 431.) "Third, the future water supplies identified and analyzed must bear a likelihood of actually proving available; speculative sources and unrealistic allocations ('paper water') are insufficient bases for decisionmaking under CEQA." (*Id.* at p. 432.) "Finally, where, despite a full discussion, it is impossible to confidently determine that anticipated future water sources will be available, CEQA requires some discussion of possible

16

replacement sources or alternatives to use of the anticipated water, and of the environmental consequences of those contingencies." (*Ibid.*)

"The ultimate question under CEQA, moreover, is not whether an EIR establishes a likely source of water, but whether it adequately addresses the reasonably foreseeable *impacts* of supplying water to the project." (*Vineyard, supra*, 40 Cal.4th at p. 434.) "If the uncertainties inherent in long-term land use and water planning make it impossible to confidently identify the future water sources, an EIR may satisfy CEQA if it acknowledges the degree of uncertainty involved, discusses the reasonably foreseeable alternatives—including alternative water sources and the option of curtailing the development if sufficient water is not available for later phases—and discloses the significant foreseeable environmental effects of each alternative, as well as mitigation measures to minimize each adverse impact." (*Ibid.*, citing § 21100, subd. (b).) An EIR need not identify a guaranteed source of water to be sufficient, however, because "[i]f an EIR were required to identify a guaranteed source of water, then no EIR would ever be sufficient." (*Western Placer Citizens for an Agricultural & Rural Environment v. County of Placer* (2006) 144 Cal.App.4th 890, 908–909 (*Western Placer Citizens*) [concluding the EIR demonstrated sufficient existing and available sources of water for the project].)

### 4. The Record Contains Insufficient Evidence of Adequate Water Supplies for a 50-Year Project Lifespan

When we begin to assess whether sufficient evidence supports the conclusion that the Project's water supply will be adequate, we see the mischief created by the conflicting lifespan descriptions. As discussed above, many of the references in the final CEQA documents focus on a 30-year Project lifespan; yet Respondents claim that the EIR demonstrates an adequate water supply is available for 50 years. We disagree with this claim.

17

Respondents contend that, "[a]lthough IID's projections only looked out to 2055, the EIR reasonably concluded that '[t]he amount of water available and the stability of the IID water supply along with on-farm and system efficiency conservation and other measures being undertaken by IID and its customers ensure that the Project's water needs will be met for the next 50 years.'" The specific page of the revised DEIR cited for this proposition references both a 50-year and a 30-year lifespan for the Project. More importantly, as discussed above, the statements related to a 50-year term appear to be based on assertions made in the *April* 2023 WSA which were disapproved on numerous grounds by IID, not the most recent one approved by the board of supervisors in December 2023. The FEIR, final WSA, and Findings of Fact certified by the board of supervisors do not claim a 50-year lifespan or a total water usage of 299,960 AF. And IID's statements do not indicate its own conservation programs funded by the IWSP can provide 50 years of water to the Project. At most, the final WSA can be read as asserting that IID is confident it can conserve and provide sufficient water to support the Project for 30 years (with a total water usage of 195,000 AF), assuming it receives its full river water entitlement.[13] Although "[t]he lead agency may make a finding that adequate water supplies exist (or do not exist) to meet the project's anticipated demand, even if that finding is inconsistent with the conclusions in the public water system's assessment" (*California Water Impact Network, supra*, 161 Cal.App.4th at p. 1487), such

---

[13] Appellants also argue that Respondents could not rely on this assertion, because IWSP water must be contracted and paid for and Respondents have not done either and, further, cannot presume IID's approval of the contract. But Appellants do not point to authority for the proposition that Respondents must have already contracted for water for a project that has not yet obtained County approval to demonstrate it complies with CEQA.

findings must be based on some credible evidence in the record. We find none here. Thus, the assertion that IID can provide a 50-year water supply lacks evidentiary support in the record.

Beyond the availability of water from IID, and particularly given the uncertainties inherent in long-term water supply planning in the Imperial Valley, Respondents could have satisfied their CEQA burden by analyzing water sources other than IID that might be reasonably likely to be able to provide water for an additional 20+ years and by discussing the reasonably foreseeable impacts of using those water sources. (*Vineyard, supra,* 40 Cal.4th at pp. 431–432, 434.) We acknowledge that the WSA is only designed to address IID's total projected available water supplies during normal, single dry, and multiple dry water years for a 20-year period. (Wat. Code, § 10910, subd. (c)(3).) The final WSA's conclusion can be read as indicating the County and IID believed it was reasonably likely IID could provide water for up to 30 years, at least if IID received its full Colorado River entitlement.[14] Beyond that period, Respondents have not directed us to anywhere in the EIR where they describe other viable water sources to meet the needs of the remaining Project term. (*Vineyard, supra,* at p. 432.) For instance, they do not discuss the possibility of purchasing water from some source other than IID, nor do they propose feasible independent conservation or augmentation projects that would help to ensure the availability of sufficient water. And, as we will discuss more thoroughly below, although Respondents offered some alternatives as mitigation measures should the federal government mandate a reduction in IID's

---

14     Notably, IID indicates elsewhere in the final WSA that it expects to exhaust the IWSP water within 20 years and that, to meet the water needs of other users, it *will* require CTR to make water conservation and augmentation commitments.

19

entitlement, they do not assert that these mitigation measures were intended to address the shortfall in reaching a 50-year Project life. Nor did the EIR satisfy CEQA's requirement of discussing "the environmental consequences of those contingencies." (*Vineyard*, at p. 432.)

Ultimately, as in *Vineyard*, the EIR's discussion of a source of water beyond the initial 20 years addressed in the final WSA "leaves too great a degree of uncertainty regarding the long-term availability of water for this project." (*Vineyard, supra*, 40 Cal.4th at p. 439.) As in *Vineyard*, "[f]actual inconsistencies and lack of clarity in the FEIR leave the reader—and the decision makers—without substantial evidence for concluding that sufficient water is, in fact, likely to be available." (*Ibid.*) Accordingly, we conclude the EIR does not satisfy CEQA because the claim that the Project has a sufficient, available source of water for 50 years is not supported by substantial evidence. (See *Western Placer Citizens, supra*, 144 Cal.App.4th at p. 909 [a water source need not be guaranteed, but the EIR should identify "existing, available, and sufficient sources of water for the project"].) We further conclude this deficiency constitutes a prejudicial abuse of discretion, because in an environment like the Imperial County, with such scarce water resources, it precluded informed decisionmaking and informed public participation, thereby thwarting statutory goals of the EIR process.

### 5. Analysis of Mitigation Measure UTIL-1

Beyond the insufficient evidence as to availability of water over the lifespan of the Project, as discussed in the previous section, the EIR fails to adequately respond to a very real threat to the IID's allocation of water to the Project, even in the short term, in the form of possible future cuts to IID's allotment of water from the Colorado River. In the DEIR's discussion of that possibility, i.e., the mitigation measure relevant to water supply (UTIL-1), it merely noted, "[i]f the IID does not receive its annual 3.1 maf water

20

apportionment according to the QSA obligations of Colorado River water during the Project's 30-year lifespan, the Applicant shall work with IID to ensure any reduction in water availability can be managed by the Project."

IID responded in its comment letter that Respondents' "blanket statement that [they] will work with IID to ensure reductions of water are managed is not an acceptable mitigation. As per the WSA Template approved by Imperial County and IID, the project proponent must identify specific measures of how a proportional percentage of water will be curtailed if water supply reductions were ordered by an agency having jurisdictional authority."

As noted above, Respondents revised UTIL-1 on the eve of the board of supervisors' meeting. The existing language remained, and Respondents then added: "Under an authorized water supply agreement, the Hell's Kitchen PowerCo 1 and LithiumCo 1 Project will be required to acknowledge and accept as a condition of water service that to the extent that IID receives an order or directive from a governmental authority, having appropriate jurisdiction, that reduces the total volume of water available to IID from the Colorado River during all or any part of their water service agreement, IID may reduce the water service agreement amount, as directed by the IID Board, as a proportionate reduction of the total volume of water available to IID. This reduction is separate from and in addition to any allocation authorized pursuant to the Equitable Distribution Plan." In other words, if, for example, the federal government reduced the volume of river water allotted to IID, IID would proportionately reduce the amount of water provided for the Project.

The revised version of UTIL-1 expanded on the offer to "work with" IID, explaining that "[a]dditional operational changes may be implemented by the

21

Project under these unpredictable conditions" such as (1) "produc[ing] groundwater at property"; (2) "explor[ing] temporary use of recycled drain water; and/or"; (3) "reduc[ing] production rates in line with water supply reductions." Respondents estimated that "[i]ncorporation of these additional measures" would conserve an estimated 945 AFY of water supply demand or "approximately 15 percent of overall water supply demand for the Project."

Appellants highlight numerous ways in which UTIL-1 violates CEQA. First, they argue that, by issuing the revised UTIL-1 late (after the FEIR was released to the public and the day before the board of supervisors approved the project), Respondents violated CEQA's public disclosure and evaluation requirements. Second, Appellants contend the revised UTIL-1 lists only what the Project "may" do if water cutbacks occur, which fails CEQA's requirements to make enforceable commitments and set enforceable performance standards (citing Guidelines, § 15126.4, subd. (a)(1)(B), (D)). Third, they maintain that CEQA requires analysis of the potential consequences of the proposed mitigation measure of pumping groundwater (citing Guidelines, § 15126.4, subd. (a)(1)(D)). Appellants note this is particularly so since the EIR repeatedly states that groundwater will not be used at the Project site. They also highlight the State Lands Commission's concern that any use of groundwater could "impede groundwater basin management" and point out there is no evidence that it would be feasible to turn the brine beneath the Project site, which contains arsenic and heavy metals, into usable process water for the lithium extraction facility. Fourth, Appellants contend the mitigation measure of proportionate cutbacks in production contradicts the alternatives analysis wherein the EIR states that reducing the Project size is infeasible. Fifth, they note that no analysis was done on the option to use recycled drain water, including whether it would be

22

feasible to temporarily tap IID's drains or whether IID would allow such use. They contend such an analysis must assess the environmental impact of diverting an unspecified amount of drain water from flowing to the Salton Sea and address possible mitigation of this impact. On this point, they highlight that this mitigation also does not square with the EIR's assertion that " 'the Project would not result in a reduction in drainage flow to the Salton Sea.' "

In response, Respondents assert that "the speculative nature of such impacts rendered them incapable of meaningful review." They contend "[t]he possibility of a government mandated water supply reduction, the amount of such a reduction, the length of time of such a reduction, etc., are all data points that do not exist and the potential impacts of addressing such a hypothetical shortfall cannot be analyzed at this time and would require future environmental review."

Because resolution of these issues turns on whether the EIR contained sufficient discussion of mitigation measures under CEQA law and served its purpose as an informational document, our review is de novo. (See *Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 516 (*Sierra Club*).)

As a threshold matter, we disagree that the impacts of these mitigation measures were too speculative to review. First, the possibility of a government mandated water supply reduction is entirely foreseeable; such foreseeability is precisely why Respondents proposed mitigation measures. Moreover, IID's letter explains that the County approved the WSA template used for all projects and that in each WSA, "the project proponent must identify specific measures of how a proportional percentage of water will be curtailed if water supply reductions were ordered by an agency having jurisdictional authority."

23

Thus, there is no question the County knew it was required to identify what specific measures it would take in response to a water shortage and that a promise to "work with" IID would be insufficient.  And the requirement of identifying how water "*will be* curtailed" (italics added) implies the measures must be feasible and appropriate for implementation.  The final WSA itself also indicates reductions in IID's allocation are likely, as it explains that "[g]iven the Colorado River conditions, the likelihood that IID will not receive its annual 3.1 MAF apportionment less QSA/Transfer Agreement obligations of Colorado River water is no longer low despite the high priority of the IID entitlement relative to other Colorado River contractors . . . .  Given the prolonged drought conditions and recent communication from the Department of the Interior, reductions to all basin contractors, including IID, are increasingly likely."

Furthermore, although the amount of any such reduction is unknown, Appellants' point is that *any* use of groundwater or drain water could cause a significant environmental effect, and the EIR does not discuss these impacts at all.  The Guidelines make clear that "[i]f a mitigation measure would cause one or more significant effects in addition to those that would be caused by the project as proposed, the effects of the mitigation measure shall be discussed but in less detail than the significant effects of the project as proposed."  (Guidelines, § 15126.4, subd. (a)(1)(D).)  Here, the DEIR acknowledges that impacts to groundwater may be significant in that it considers as a threshold of significance whether the Project will "[s]ubstantially decrease groundwater supplies or interfere substantially with groundwater recharge such that the project may impede sustainable groundwater management of the basin[.]"  But the EIR does not explain that any impacts of the mitigation measure would be less than significant.

24

Rather, the EIR contains *no* discussion of the impact of using groundwater; instead, the revised DEIR states that groundwater will not be used in the Project.

Likewise, IID has stated that diversion of drain water would decrease inflow to the Salton Sea, and Respondents acknowledge that "[t]he record shows that the shrinking Salton Sea is the main contributor to poor air quality because of exposed playa [seabed]." Nonetheless, Respondents did not address this impact of the drain water mitigation measure.

Because government mandated cutbacks in river water supply were foreseeable, even if the duration was unknown, CEQA required analysis of the potentially significant effects caused by these measures. (Guidelines, § 15126.4, subd. (a)(1)(D).)

Furthermore, the EIR also must include evidence that the mitigation measures are "feasible." (Guidelines, § 15126.4, subd. (a)(1).) It is true, as both parties acknowledge, that "[t]he specific details of a mitigation measure . . . may be developed after project approval when it is impractical or infeasible to include those details during the project's environmental review." (*Id.*, § 15126.4, subd. (a)(1)(B).) But even if such a deferral is justified, which is not certain in this case, it is only authorized under the Guidelines if the agency "(1) commits itself to the mitigation, (2) adopts specific performance standards the mitigation will achieve, and (3) identifies the type(s) of potential action(s) that can feasibly achieve that performance standard and that will be considered, analyzed, and potentially incorporated in the mitigation measure." (*Ibid.*) Respondents contend UTIL-1 commits CTR to implement water reductions proportionate to any government mandated water reduction imposed on IID and includes a specific performance standard of such proportionate reductions. They also assert without elaboration that

25

UTIL-1's options are feasible and were agreed to by the County and IID (citing the final WSA).

Even if we accept Respondents' assertions as to the first two prongs, we are not persuaded substantial evidence in the record supports the conclusion that these mitigation measures are feasible. "CEQA defines ' "[f]easible" ' as 'capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors.' " (*Natural Resources Defense Council, Inc. v. City of Los Angeles* (2023) 98 Cal.App.5th 1176, 1202, quoting § 21061.1; Guidelines, § 15364.) Portions of the revised DEIR unchanged by the FEIR indicate that "[g]roundwater underlying the Imperial Valley is generally of poor quality and unsuitable for domestic or irrigation purposes," groundwater usage is regulated (see, e.g., Wat. Code, §§ 10720 et seq. [Sustainable Groundwater Management Act], 10910, subd. (f)), there are no water-related wells on the Project property, and IID does not operate water wells or groundwater recharge areas.

As for drain water, Respondents acknowledge later in their brief that any actual use of recycled drain water would require a separate water supply agreement with IID and additional CEQA review. There also is no indication as to whether CTR could temporarily tap IID's drains or feasibly use the contaminated agricultural runoff water they contain. It does not appear the Project otherwise has access to drain water or creates wastewater that flows into IID drains. Thus, the record does not disclose that "produc[ing] groundwater" or using "recycled drain water" are feasible mitigation measures such that Respondents satisfied their CEQA obligations by simply listing them without discussion in the final WSA and Findings of Fact. (See Guidelines, § 15126.4, subd. (a)(1)(B).)

26

As for the third mitigation measure of reducing production rates, as the EIR once again contains no discussion at all regarding this proposed mitigation measure, there is no evidence it is logistically or economically feasible. In particular, given the unresolved logistical hurdles of the first two proposed mitigation measures, there is no indication that reduced production alone can make up for a substantial water cutback. The EIR does not discuss how Respondents calculated their conservation estimate of 945 AFY, which in referring to "these additional measures" appears to be based on implementation of all three proposed operational changes, or why the analysis is based on a 15 percent reduction. As Appellants point out, this measure also conflicts with the EIR's alternatives analysis in which it found a reduced Project size infeasible because "[e]ngineers have not been able to identify a feasible way to scale the Project down."[15] Thus, the EIR again falls short of "includ[ing] enough detail 'to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' " (*Sierra Club, supra*, 6 Cal.5th at p. 516.)

---

[15] To the extent Appellants tangentially challenge the EIR's analysis of alternatives to the Project as part of this argument, Appellants have not met their burden of proving that the EIR is legally inadequate (see *State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 723), and we do not address it further. Aside from citing to Guidelines section 15126.6, subdivision (a), which requires the EIR to describe a range of reasonable alternatives to the project, Appellants provide no analysis or legal argument supporting their claim. Furthermore, it is mentioned under a heading challenging mitigation measure UTIL-1, not project alternatives. Court rules require each argument to be stated under a separate heading (Cal. Rules of Court, rule 8.204(a)(1)(B)), and we are not required to "consider all of the loose and disparate arguments that are not clearly set out in a heading and supported by reasoned legal argument." (*Provost v. Regents of University of California* (2011) 201 Cal.App.4th 1289, 1294.)

27

Accordingly, we conclude that in omitting the required discussion of feasible mitigation measures addressing a future water supply shortage, the EIR failed to serve its purpose as an informational document in violation of CEQA.[16]

## C. Cumulative Water Supply Impacts

Appellants contend the EIR's cumulative water impact analysis should have considered the three geothermal developments proposed by Berkshire Hathaway Energy Renewables (BHER), the County's own Lithium Valley Specific Plan (LV Specific Plan), and CTR's larger, late-disclosed plans for six more lithium extraction facilities. Respondents counter that the EIR was not required to consider these projects because they were not reasonably probable future projects at the time the County issued the NOP, which Respondents contend is the appropriate baseline for evaluating cumulative impacts.[17] Here we agree with Respondents.

---

[16] To the extent Appellants argue the revised UTIL-1 was released late (after the final EIR was released to the public and the day before the board of supervisors approved the project) with no opportunity for public comment, they have not adequately supported their claim of error with legal analysis. The opening brief does not state which of "CEQA's public disclosure and evaluation requirements" were violated. Nor does it say recirculation was required under *Vineyard*. Accordingly, we decline to address this argument further (*United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 153), although we acknowledge it is largely rendered moot by our analysis.

[17] In a request for judicial notice dated October 23, 2025, Respondents ask this court to take judicial notice of documents related to these three BHER projects and the LV Specific Plan that were not part of the administrative record. But as Respondents pointed out in their brief, our high court has confirmed that "it would never be proper to take judicial notice of evidence that (1) is absent from the administrative record, *and* (2) was not before the agency at the time it made its decision." (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 573, fn. 4.) That is correct and thus this

### 1. Legal Principles

"The cumulative impact from several projects is the change in the environment which results from the incremental impact of the project when added to other closely related past, present, and reasonably foreseeable probable future projects." (Guidelines, § 15355, subd. (b); *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 394 (*Laurel Heights*).) Because the significance of impacts is measured against baseline physical environmental conditions in the vicinity of the project, the lead agency generally should use conditions "as they exist at the time the notice of preparation is published." (Guidelines, § 15125, subd. (a)(1); *South of Market Community Action Network v. City and County of San Francisco* (2019) 33 Cal.App.5th 321, 337 (*South of Market*).) However, "[n]either CEQA nor the CEQA Guidelines mandates a uniform, inflexible rule for determination of the existing conditions baseline." (*Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 328 (*Communities for a Better Environment*).) Rather, an agency has discretion to decide what time frame of predicted physical conditions without the project most realistically reflects baseline conditions. (*Id.* at pp. 327–328.) "[I]n appropriate circumstances an

---

information is not relevant. Furthermore, it is Appellants' burden to show the status of these projects and that the County was required to consider them in the EIR. It is not Respondents' burden to show they were not ripe for consideration. For these reasons, the request is denied.

We likewise deny Appellants' December 2, 2025 request for judicial notice in support of their reply brief and in response to Respondents' judicial notice request. It requests that we consider documents for proceedings related to the BHER and CTR projects that occurred after the judgment subject to appeal. These documents were not before the board of supervisors when it made its determination on the Project and are not relevant or helpful to our determination on appeal.

existing conditions analysis may take account of environmental conditions that will exist when the project begins operations; the agency is not strictly limited to those prevailing during the period of EIR preparation." (*Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 452 (*Neighbors for Smart Rail*).) Similarly, "[a]n agency may, where appropriate, adjust its existing conditions baseline to account for a major change in environmental conditions that is expected to occur before project implementation." (*Ibid.*)

We review the agency's decision as to how to measure the existing physical conditions for substantial evidence. (*Communities for a Better Environment, supra*, 48 Cal.4th at p. 328.)

### 2. Analysis

As set forth above, the date of publication of the NOP is the default cutoff in determining which existing and probable future projects must be considered in conducting a cumulative impacts analysis. (Guidelines, § 15125, subd. (a)(1); *South of Market, supra*, 33 Cal.App.5th at p. 337.) Here, the County elected to use the NOP date of March 2022 as the cutoff for other projects, although it had discretion to adjust its existing conditions baseline so long as the date provided a realistic picture of existing conditions. (See *Neighbors for Smart Rail, supra*, 57 Cal.4th at p. 452.) Thus, we consider two related questions: first, whether substantial evidence supports the County's conclusion that using the NOP date provided a realistic picture of existing conditions; and second, whether the specified projects were "reasonably foreseeable probable future projects." (See *id.*, at pp. 462–463.)

A "probable future project" has been interpreted as one that is under environmental review and is sufficiently quantified. (*San Franciscans for Reasonable Growth v. City and County of San Francisco* (1984) 151 Cal.App.3d 61, 76–77.) The same court defined "under environmental

30

review" as including "those related projects for which an EIR has been required and also those related projects for which a negative declaration (current Guidelines, §§ 15070–15075, 15371), a statutory exemption (current Guidelines, §§ 15260–15277), or a categorical exemption (current Guidelines, §§ 15300–15329, 15354) is being considered." (*Id.* at p. 74, fn. 13.) It also clarified that an agency must consider projects " 'outside the control of the agency,' " and "where feasible . . . use reasonable efforts to discover, disclose, and discuss related projects which are under the administrative jurisdictions of other city, state, and federal agencies." (*Ibid.*)

Even within the context of evaluating the environmental effects of probable future activities *within* the project subject to the EIR and within the lead agency's own control, our Supreme Court has only required a discussion of those impacts where the agency "can provide meaningful, reliable data." (*Laurel Heights, supra*, 47 Cal.3d at p. 398.) As one court phrased it, "any future project where the applicant has devoted significant time and financial resources to prepare for any regulatory review should be considered as probable future projects for the purposes of cumulative impact." (*Gray v. County of Madera* (2008) 167 Cal.App.4th 1099, 1127–1128 [but finding substantial evidence supporting the exclusion of any planned expansions where "the County could not locate any project where an applicant has filed for review with the county planning department"].) "[M]ere awareness of proposed expansion plans or other proposed development does not necessarily require the inclusion of those proposed projects in the EIR." (*Id.* at p. 1127.) And no discussion of impacts is required for specific "future action 'that is merely contemplated or a gleam in a planner's eye.' " (*Ibid.*; *City of Maywood v. Los Angeles Unified School Dist.* (2012) 208 Cal.App.4th 362, 397.)

31

Appellants' argument does not seem to be so much that any of the other projects *were* probable future projects on the NOP date or that Respondents were required to consider them because they were known at that time to be projects that "will exist when the project begins operations." (See *Neighbors for Smart Rail, supra*, 57 Cal.4th at p. 452.) Rather, their contention seems to be that if projects *become* "probable future projects" at any time prior to the EIR's certification, the EIR proponent must revise its cumulative impacts analysis to consider them.

Appellants have not persuaded us that this is required. An EIR is, in essence, a good faith prediction of (1) the impacts a project will have on the existing environment when it is implemented, if it is approved, and (2) whether existing conditions will have changed appreciably by the time the project begins operations. (*Neighbors for Smart Rail, supra*, 57 Cal.4th at p. 452.) An argument could be made that an agency should consider significant and reasonably definite changes in baseline conditions that become known prior to issuance of the EIR or possibly during the public comment period such that they could be incorporated into the final EIR. But to avoid the EIR process going on forever, there has to be some cutoff for when the applicant must make their prediction. Requiring applicants to go back *after* issuance of the final EIR and consider newly arisen cumulative impacts that were not reasonably predictable at or soon after the NOP date may well result in an agency having to reopen the comment period and engage in endless review and revision. Appellants have not demonstrated this is required by CEQA.

As we discuss below, even if we were to conclude that the EIR should not have relied on the March 2022 NOP date, none of the specified projects

32

were sufficiently developed to constitute a "probable future project" by the time of the issuance of the FEIR.

### a. BHER Projects

Appellants contend three BHER projects— Morton Bay Geothermal, Black Rock Geothermal, and Elmore North Geothermal—were "under review" by April 2023 when they were submitted to the California Energy Commission (CEC) and therefore Respondents were required to consider these projects. We disagree.

As an initial matter, the portion of the administrative record Appellants cite does not confirm that the review before the CEC was a "CEQA-equivalent review process" as Appellants claim. None of the April 2023 "Application[s] for Certification" to the CEC provide any evidence of the anticipated water use by any of the facilities or even evidence that anticipated water use must normally be disclosed during this certification process. Moreover, the cited portion of IID's comment letter suggests an environmental review had not begun as it referred to these projects as " 'currently under the permitting process.' " Large projects require multiple permits in addition to certification of CEQA compliance, but IID's letter does not indicate the type of permit being sought or whether any water use assessment was prepared or provided as part of that process. If IID was responsible for providing this water allocation, it should have been aware of the amount had a specific request been made. Yet Appellants do not cite to such a figure from IID's letter. Thus, Appellants have not demonstrated the BHER projects were undergoing environmental review and were sufficiently quantified by the NOP publication date such that Respondents were required to consider them as probable future projects in their cumulative impacts analysis.

33

Nor have Appellants shown that the BHER projects' water usage was sufficiently quantified or that the projects began environmental review soon after the NOP date or by any other date prior to issuance of the FEIR on this Project such that Respondents abused their discretion in not considering them. Appellants point to their own expert's October 2023 letter stating, "we now know as a result of the August CEC public hearing for BHE's new proposed geothermal projects that . . . BHE Renewables has now requested 13,165 AFY for its three new proposed geothermal plants (not even including plans for lithium extraction)." But the letter does not attach a report or transcript as evidence supporting this figure for the proposed BHER project's water request. A November 2023 report prepared by Appellants indicates that as of June 2023, when the DEIR was issued on the instant Project, the estimated AFY of freshwater consumption for the BHER plants was "unknown" and that "BHER has not yet estimated water consumption in environmental planning documents." In other words, Appellants have not demonstrated the proposed BHER projects became sufficiently quantified probable future projects before the EIR issued or even before the public comment period for the instant Project closed in November 2023. This evidence, therefore, does not undermine Respondents' use of the NOP date.

As for Appellants' objection that the EIR inappropriately did not address the BHER projects because they were more than one mile away, this response focuses on impacts to air and hazardous materials, not water.[18]

---

18    It read, "While the cumulative impact analysis did not specifically address the three BHE Renewables Projects raised in the appeal: Morton Bay Geothermal; Black Rock Geothermal; and Elmore North Geothermal, these geothermal projects are located more than 1 mile away from the Project. The DEIR discusses that the air impacts and hazard and hazardous materials impacts would generally not combine with the Project due to the distance between the Project and these other geothermal projects."

34

Thus, this response was not relevant to Respondents' decision not to include these projects in their analysis of cumulative water supply impacts.

Finally, we are not persuaded that Respondents were required to consider the BHER plans as plants that were expected to exist by the time the Project began operations. (See *Neighbors for Smart Rail, supra*, 57 Cal.4th at p. 452.) The final WSA indicates IID subtracts water from the 25,000 AFY allotted to the IWSP after it allocates it to a project and expects to exhaust its ability to meet demand in less than 20 years. Under this scenario, whether projects that have not already requested or contracted for water would obtain water before the IWSP is exhausted and be able to proceed is entirely speculative. Likewise, as the County has ultimate authority to determine whether sufficient water exists for a project and to provide CEQA certification, projects that are not yet under environmental review cannot reasonably be categorized as "probable future projects." Appellants have not made clear why the EIR must consider projects that are not as far along in the development and approval process. Moreover, given this sequential process for allocating water from one source and the speculative nature of the proposed BHER projects, Appellants also have not shown Respondents were required to respond to comment letters requesting consideration of projects that were not yet under environmental review. Accordingly, we find no error as to the analysis of cumulative impacts related to water supply as to the proposed BHER projects.

### b. LV Specific Plan

Appellants likewise fail to persuade us the EIR was required to consider the LV Specific Plan, which is being developed by the Imperial County Planning & Development Services Department. As evidence cited by Appellants demonstrates, it was not under review by the NOP date or even by the time this Project's FEIR issued.

35

In November 2023, the director sent a letter to the board of supervisors providing land use alternatives for the proposed project. Within this letter, he explained that "[a] Programmatic Environmental Impact Report (PEIR) will be prepared as soon as a preferred Land Use Alternative is selected," which "will disclose all foreseeable environmental impacts if the Lithium Valley Specific Plan were to be implemented." The record also contains a NOP of draft programmatic EIR indicating a public scoping meeting for the proposed programmatic EIR would be held on December 14, 2023. (See Guidelines, §§ 15082, 15083 [a scoping meeting provides an opportunity for early consultation between the lead agency and "responsible and trustee agenc[ies]" to determine "the scope and content of the environmental information that the responsible or trustee agency may require" in the draft EIR].)

Thus, whether the project would occur at all and, if so, where, was still up in the air in November 2023, when the comment period for the instant Project was closing, and no draft programmatic EIR for the LV Specific Plan had been submitted for public comment by the December 13, 2023 Planning Commission hearing on the instant Project's EIR. As Respondents highlight, Appellants also do not point to any evidence in the administrative record regarding the LV Specific Plan's purported water use. In other words, there is no evidence this project's water usage was sufficiently quantified by the NOP date or at any time soon thereafter that might support using a later date to reflect realistic baseline cumulative impacts to water.

We also disagree that the County was required to consider this project because the County itself had developed it and devoted time and resources to the plan. Even though it was within the lead agency's control, the EIR was only required to discuss it if the agency "[could] provide meaningful, reliable

data" (*Laurel Heights, supra*, 47 Cal.3d at p. 398) to be included in the EIR, which Appellants have not shown was the case here.

Furthermore, this situation is distinguishable from *City of Antioch v. City Council* (1986) 187 Cal.App.3d 1325, 1337–1338, relied on by Appellants, because there the only purpose for the road to nowhere and accompanying sewer project was to spur further development in the immediate area. Accordingly, the court concluded the city must "assume the *general* form, location and amount of such development that now seems reasonable to anticipate, as the developer has doubtless already done, and evaluate that development by means of the EIR process." (*Id.* at p. 1338.) Here, the projects are unrelated, and the instant Project could proceed and function independently regardless of whether the LV Specific Plan is ever approved.[19]

### c. CTR's Expanded Project

Appellants argue the EIR also should have considered CTR's plans to create a 190-acre, seven-stage campus, which it announced shortly after the Planning Commission approved the instant Project on December 13, 2023.

---

[19]  Appellants request that we take judicial notice of a board agenda fact sheet, and the attached documents regarding the LV Specific Plan, submitted to the Imperial County Board of Supervisors on November 7, 2023 (Exhibit A).  Also attached to Exhibit A are various emails and comment letters directed to the board of supervisors prior to its hearing on the instant Project.  Even if these documents are appropriate subjects for judicial notice, which we do not determine, we need not take judicial notice of the board agenda documents as they do not differ from the information in the administrative record as to whether the LV Specific Plan was under environmental review during the relevant time period.  Likewise, the letters reflect similar concerns as those already contained in the administrative record (and notably are contained on pages 220-224 of Respondents' Appendix).  Thus, the September 11, 2025 request for judicial notice is denied as to Exhibit A.

Here again, the expanded project was not under review, and its water usage was not quantified, by the NOP release date. By Appellants' own admission, even as late as *after* this Project's initial approval, CTR's proposed expansion was only at the "concept" stage. There was no indication it would ever be approved. And Appellants have not demonstrated that the instant Project cannot function independently if the expanded project is not approved. Therefore, the County did not fail to provide an accurate picture of the Project's realistic baseline when it omitted CTR's expanded project from the EIR's cumulative water supply impacts analysis.

## D. Air Impacts Analysis

The parties agree that the main contributor to poor air quality in the communities near the Salton Sea is the reduction of inflows to the sea, which exposes more of the playa. Because pesticides and fertilizer from surrounding agricultural land have flowed into the Salton Sea for years, harmful chemical deposits are present in the playa and become airborne when the sea recedes. Yet, according to Appellants, the EIR provides no discussion of how the Project's raw water use would impact water flow into the Salton Sea and the resulting impact on air quality. In their view, this violates CEQA. We agree.

We review de novo Appellants' allegations that the EIR entirely omits required information and analysis and fails to respond to comments, and we review any factual determinations for substantial evidence. (See *Vineyard, supra*, 40 Cal.4th at 435.)

Respondents acknowledge the record shows that the shrinking Salton Sea is the main contributor to poor air quality because of exposed playa. They further acknowledge the public comment letters stating that the Project's water use would reduce the flow of drain water to the sea. However, they contend "[t]he Project will obtain its annual 6,500 acre-feet of freshwater

38

from IID's annual allocation of 25,000 acre-feet for non-agricultural projects, consistent with IID's adopted [IWSP]. [Citation.] Therefore, the Project does not use water allocated for agriculture." Accordingly, they claim reduction in water flow and poor air quality impacts are hypothetical and speculative impacts. They contend that this court must defer to the agency's conclusion that the impact was speculative.[20]

Deference is required if the factual conclusion is supported by substantial evidence. (*Santa Rita Union School Dist. v. City of Salinas* (2023) 94 Cal.App.5th 298, 349, citing *Tiburon Open Space Committee v. County of Marin* (2022) 78 Cal.App.5th 700, 728.) Here, we find a lack of substantial evidence to support a determination that the identified impacts are hypothetical and speculative. Furthermore, Respondents did not proceed as required by CEQA by failing to respond to the portion of IID's timely comment letter asserting that the Project will result in adverse air impacts. Absent an adequate response and a discussion of the potentially significant impacts to air quality, the EIR fails to serve its purpose as an informational document. (*Sierra Club, supra*, 6 Cal.5th at p. 516.)

As noted above, the vast majority of the water that IID receives from the Colorado River—97 to 98 percent—is allocated to agricultural uses, and runoff from agricultural uses drains into the Salton Sea. The EIR and final WSA both indicate the IWSP is a mechanism that allows a water supply that

_____

[20] Respondents also point to their response to IID's comment letter wherein they make the vague assertion that "Project Proponent will work with IID to establish best management practices and protocols to ensure the Project does not result in impacts to inflow to the Salton Sea and is in compliance with the Salton Sea Conservancy for Operations and Maintenance. No impact has been established and impacts are theoretical; however, the Project Proponent will work with IID to ensure the Project is in compliance with all regulations and requirements regarding drainage flow into the Salton Sea."

39

would otherwise be used for agriculture and other uses to be conserved and redirected for use by new non-agricultural projects. Therefore, it follows that any effective conservation would be achieved by conserving water otherwise used at least in part for agriculture.

If water that would otherwise be used for agriculture is instead devoted to non-agricultural uses, the drainage into the Salton Sea would necessarily be reduced. Water used by the Project would not flow to the Salton Sea because the Project recycles water instead of releasing it into drains. Both parties acknowledge that any reduced drainage into the sea will lead to an expansion of the playa and a resulting increase in poor air quality. Therefore, it is reasonable to conclude that when IID redirects conserved water to the Project, it likely will adversely impact air quality.

IID's November 22, 2023 letter supports this understanding, stating that "the proposed project *will* result in a net annual reduction of drainage flow to the Salton Sea." (Italics added.) IID maintains that "[t]he discussion should determine the net anticipated reduction in drainage flow after taking into consideration that *none of* the project's 6,500 AFY of water supply will be discharged into the drains that support the Salton Sea." (Italics added.) Lest there be a question as to whether the reduction would impact air quality, IID explained: "In general, IID's comments under hydrology and utility systems (as it relates to water supply) are both directly and indirectly tied to air quality. A reduction of drainage flow into IID drains and the Salton Sea may affect the level of drainage vegetation and exposed playa which in turn could result in increased dust emissions without proper mitigation. A full assessment of the project and/or cumulative impacts to the Salton Sea is essential including the consideration of mitigation measures on how this

project can contribute independently or to the Salton Sea Conservancy for Operation and Maintenance or apply other means of mitigation."

Respondents did not respond to the portion of IID's letter pointing out the Project's impact on air quality, as required by CEQA. (See § 21091, subd. (d)(1), (2); Guidelines, § 15088.) The assertions that no impacts to inflow to the Salton Sea have been established and that any such impacts are theoretical do not explain or resolve the express discrepancy between Respondents' understanding and the assertion by IID (the actual water provider) that inflows to the Salton Sea *would* be impacted and likely *would* negatively impact air quality. CEQA requires an EIR to discuss "the possible environmental effects of the project" (*County of Butte, supra*, 13 Cal.5th at p. 627), and IID's letter makes clear adverse air impacts are more than possible. Furthermore, "[t]he written response shall describe the disposition of significant environmental issues raised . . . [and] when the lead agency's position is at variance with recommendations and objections raised in the comments [the major environmental issues] must be addressed in detail giving reasons why specific comments and suggestions were not accepted. There must be good faith, reasoned analysis in response. Conclusory statements unsupported by factual information will not suffice." (Guidelines, § 15088, subd. (c).) Respondents' response to IID's comment letter in the FEIR provides just such an unsupported conclusory statement and does not suffice. Just as with Respondents' initial mitigation measure regarding water supply, a commitment to "work with IID" is not sufficient mitigation.

Respondents also argued below and reassert on appeal that the County was not required to assess the air quality impacts from using IWSP water because "[a]ny impacts associated with IID's decision to reallocate agricultural water to non-agricultural uses, including impacts due to reduced

41

drainage flows to the Salton Sea, have already been evaluated" as part of a 2009 negative declaration. There is only one reference to this negative declaration in the December 2023 WSA,[21] and although the negative declaration itself is not attached, Respondents complied with the CEQA Guidelines for incorporating a document by reference by listing "the state identification number of the incorporated document."[22] (Guidelines, § 15150, subd. (d).)[23]

We conclude the negative declaration does not support Respondents' claim. The 2009 negative declaration explains that it is a programmatic EIR and that "[t]he only potential environmental effect of the policy at this point in time is on IID's water supply." It clarifies that the IWSP "provides a mechanism to obtain monies to fund the development of new water supplies

---

[21] It states, "The environmental impacts of conserving up to the 25,000 acre-feet of IWSP water were analyzed in the *Imperial Irrigation District Interim Water Supply Policy for Non-Agricultural Projects* Negative Declaration, State Clearinghouse No. 2009061103 dated June 25, 2009. The IID Board adopted this Negative Declaration on September 29, 2009."

[22] Appellants contend the County did not comply with the Guidelines, which require making the document incorporated by reference available in a public building. However, subdivision (d) of this provision provides that the agency also may list "the state identification number of the incorporated document," which Respondents did here. (Guidelines, § 15150, subd. (d).)

[23] Respondents asked the court below to take judicial notice of the negative declaration, but it does not appear the court ruled on the request. Because we conclude it was properly incorporated by reference, and thus is part of the administrative record, we consider it for purposes of evaluating whether it provided substantial evidence supporting Respondents' assertion that it was not required to evaluate any air impacts from use of IWSP water because environmental impacts due to reduced drainage flows to the Salton Sea were already evaluated as part of a 2009 negative declaration process.

42

to support the development of new commercial and industrial ventures." Whether a new proposed user relies on water supplied from IID as a result of new water supply projects it created or "elect[s] to provide some or all of the required water supply by paying for and implementing some other means of providing water in a manner approved by [IID], such as conservation projects, water storage projects and/or use of an alternative source of supply, such as recycled water," the negative declaration specifies that the responsibility for addressing environmental compliance for new development projects lies with the County of Imperial.  It makes clear that it "does not address the potential effects on the environment of specific new water supply, replacement and or storage projects that may be funded, in whole or in part, by [IID] through Water Supply Development Fees collected by [IID] pursuant to the IWSP.  CEQA compliance for such projects will be addressed when such projects are defined and proposed for development."  Thus, by its terms, the negative declaration does not include any analysis of environmental impacts other than water supply.

The negative declaration also states that approximately 97 percent of the water IID delivers is used for agricultural purposes, and "[w]ater reserved under the IWSP, but not yet utilized, will be available for agricultural use during ramp up years."  The reasonable inference from these statements is that at least some of the unallocated water supply the Project relies on *would be* diverted from agricultural uses as IID stated and, thus, that the Project would decrease the amount of runoff to the Salton Sea.  The negative declaration does not include an evaluation of air impacts.  And it repeats multiple times that it did not investigate the environmental effects of future water use projects and that the County would need to engage in the full CEQA analysis of any project proposed under the IWSP.  Notably, this is

43

reiterated in the IWSP itself, as it states that "[w]hen determining whether to approve a water supply agreement for any Non-Agricultural Project pursuant to this IWSP, the District will consider whether potential environmental and water supply impacts of such proposed projects have been adequately assessed, appropriate mitigation has been developed and appropriate conditions have been adopted . . . ." Therefore, the text of the negative declaration does not support Respondents' claim that the IWSP's environmental effects have already been evaluated.

Ultimately, the EIR inadequately responded to comments and provided factually unsupported grounds for its assertions that any air quality assessment related to exposed Salton Sea playa was unnecessary. Thus, the EIR response does not constitute a good faith effort at full disclosure (see Guidelines, § 15151), and Respondents have failed to proceed in the manner required by CEQA by not discussing this probable impact in the EIR.[24]

---

[24] Appellants also briefly raise three additional issues. First, they contend the EIR buried the discussion of the health impacts of airborne particulates created or exacerbated by the Project in Appendix B. To the extent this analysis requires elaboration or insertion into the body of the EIR after consideration of the air impacts of diverting water from the Salton Sea, Respondents should do so then. Second, Appellants object that the FEIR did not adequately respond to comments and concerns raised by the Imperial County Air Pollution Control District. But Appellants do not lay out the EIR's response to the letter, nor do they explain why no substantial evidence in the record supports the County's use of a different emissions model. Accordingly, Appellants have not met their burden on this claim. Finally, Appellants challenge the EIR's failure to respond to a comment letter submitted by the Leadership Counsel for Justice and Accountability on October 23, 2022 (attached as an exhibit in the administrative record to a letter from Appellants' counsel dated December 22, 2023), but do not explain why Respondents were required to respond when both letters fell outside of the public comment period. (See Guidelines, § 15088, subd. (a) ["The lead agency shall respond to comments raising significant environmental issues

44

### E. Tribal Consultation

Appellants contend the County failed to engage in meaningful and timely tribal consultation to identify and mitigate the Project's impacts to tribal cultural resources (TCRs) as required by CEQA. We conclude Appellants have not established a lack of required consultation.

#### 1. Additional Facts

Appendix E to the revised DEIR contains the results of an archival search indicating that 17 prior cultural resource investigations had taken place within a half-mile radius of the Project area. In 2016, during a prior consultation for the Hell's Kitchen Exploratory Well Project, and in connection with that consultation, a cultural resources consultant contacted the Native American Heritage Commission (NAHC). The NAHC provided contact information for 36 tribal representatives, each of whom staff contacted. Two tribes, the Morongo Band of Mission Indians and the Agua Caliente Band of Cahuilla Indians, responded. The Morongo Band of Mission Indians expressed concern and requested monitoring by a Cahuilla representative during construction activities. The Agua Caliente Band of Cahuilla Indians responded that the Project area was beyond their traditional use area.

On October 12, 2017, a meeting occurred with representatives of CTR and the Quechan Tribe. The Quechan Tribe's representative, Manfred Scott, expressed concern about the visual impact on the view from Mullett Island of adding another geothermal plant but did not make clear how the significance of any TCRs might be adversely impacted by the Project. A second meeting occurred on November 6, 2017, with representatives of CTR, the Cabazon Band of Mission Indians, the Torrez Martinez Desert Cahuilla Indians, and

received during the noticed comment period and any extensions and may respond to late comments."].)

45

Carmen Lucas of the Kwaaymii Tribe. The Cabazon Band of Mission Indians' and Torrez Martinez Desert Cahuilla Indians' representatives stated that they had no particular concerns about TCRs in the Project area. Lucas stated that Obsidian Butte, which is located several miles away from the HKG site, was a prehistorically important location to local tribes and that a CEC archaeologist prepared a National Register of Historic Places nomination for the site 10 years prior but had never submitted it. She requested that the nomination be submitted in association with the HKG project. She described birds that once nested on Mullet Island, explained how they were historically important to local tribes, and asked if they have been, or could be, provided with a suitable alternative nesting site. Finally, she asked to be involved in the cultural resource survey of the HKG project area.

In connection with the Project before us, on April 2021, a consultant for the current Project requested an updated Sacred Lands File search from the NAHC. The NAHC provided the search results along with contact information for 24 tribes, all of which were contacted by the consultant. The list included the Quechan, Torres-Martinez, Morongo, and Kwaaymii tribes, with Lucas and Scott specifically listed as contacts for their respective tribes.

On March 21, 2022, Imperial County sent letters to the Quechan and Torres-Martinez Indian Tribes pursuant to Assembly Bill No. 52. An email from a County representative indicated letters were sent to "the tribes that the County consults with." The letter stated that the Sacred Lands File search indicated that sacred sites had been identified within a one-mile radius of the Project and that the California Historical Resources Information System records search showed four previously recorded cultural resources located within a half-mile radius of the Project site, but that none were

46

within the Project footprint. The Quechan responded on April 5, 2022, requesting consultation, and Scott met with County representatives on May 20, 2022. He expressed surprise that there was no follow up on the field visit he said that they had requested during the 2017 meeting.[25]

On September 29, 2022, Lucas sent a letter requesting that her name and address "be added on the Imperial County SB-18 and SB52 consultation list" and indicated that her request included a consultation request for "the Specific Plan & PECR [*sic*] for lithium recovery."

The County opened the public comment period on the draft EIR on September 8, 2023. The draft EIR stated that there were "no known tribal cultural resources within the Project site" and provided as a mitigation measure that a tribal monitor could attend the preconstruction briefing and an archeological specialist would monitor all ground-disturbing work. It also stated that all consulting Native American tribal groups that requested notification of any unanticipated discovery of archaeological resources on the Project shall be notified appropriately of any discoveries during construction. Lucas submitted a draft EIR comment letter on October 23, 2023, referencing her letter the year before as well as TCRs including the Southeast Lake Cahuilla Active Volcanic Cultural District (Lucas clarified at another time that Lake Cahuilla is the Salton Sea), Mullet Island, and "the (new) mud pots." She also noted that the DEIR omitted a requirement of qualified tribal monitors during project surveys and construction as well as alternatives to the Project.

The public comment period closed on November 30, 2023. The FEIR did not alter the tribal cultural resources analysis contained in the DEIR. In

_____

[25] The minutes from the 2017 meeting do not reflect a request for a field visit.

47

response to Lucas's October 2023 comment letter, the County responded that it contacted all tribes that had requested consultation and that her September 2022 letter requested consultation for a different project—the LV Specific Plan.

On December 8, 2023, Lucas submitted another letter in response to the FEIR and provided a confidential map of the Southeast Lake Cahuilla Active Volcanic Cultural District. She also spoke during the December 2023 Planning Commission hearing and the board of supervisors meeting in January 2024.

### 2. Legal Principles

Assembly Bill No. 52 modified CEQA in 2015 to specify that "[a] project with an effect that may cause a substantial adverse change in the significance of a tribal cultural resource is a project that may have a significant effect on the environment." (§ 21084.2.) CEQA now requires that "[p]rior to the release of a negative declaration, mitigated negative declaration, or environmental impact report for a project, the lead agency shall begin consultation with a California Native American tribe that is traditionally and culturally affiliated with the geographic area of the proposed project if: (1) the California Native American tribe requested to the lead agency, in writing, to be informed by the lead agency through formal notification of proposed projects in the geographic area that is traditionally and culturally affiliated with the tribe, and (2) the California Native American tribe responds, in writing, within 30 days of receipt of the formal notification, and requests the consultation." (§ 21080.3.1, subd. (b).)

"The lead agency *may* consult directly with: (1) Any person who has special expertise with respect to any environmental impact involved, [or] (2) Any member of the public who has filed a written request for notice with

48

the lead agency or the clerk of the governing body. . . ."  (Guidelines, § 15086, subd. (b), italics added.)

### 3. Analysis

Appellants assert that "Ms. Lucas of the Kwaaymii Laguna Band in September 2022 had specifically stated 'I am *also* specifically requesting Consultation' on 'the specific plan' and '[Program] EIR for lithium recovery' for other lithium projects.  [Citation.]  Because the CTR Project site is within the boundaries of the LV Specific Plan area [citation], the County should have known this request included a request for consultation about the Project site."

The September 2022 letter did not mandate consultation under Assembly Bill No. 52.  First, the FEIR contains evidence that letters were sent to all 24 tribes identified by the Native American Contact Program in April 2021, but there is no indication in the record that Lucas responded to this letter at any time prior to the consultation period or requested in writing to be provided with formal notification of proposed projects in the area.[26]  (See § 21080.3.1, subd. (b).)  As a result, the County was not required to send her an Assembly Bill No. 52 letter on March 21, 2022.  Further, she did not provide a written request for consultation within 30 days of that date, as required by the statute.  (See § 21080.3.1, subd. (b).)  Although the County

[26]    Additionally, her 2017 request to be involved in the cultural resource survey of the HKG project area appears to have been made orally and thus, even if it could be construed as a request for notification, technically it did not satisfy CEQA's requirement that the request for notification be made in writing.  (See § 21080.3.1, subd. (b).)  Although adhering to the letter of such requirements may seem unduly stringent, given the vast amount of data a party preparing an EIR must harness and the many requirements it must comply with, asking an applicant to keep track of oral requests made years before and letters received outside of the mandated submission period is not a trivial request.

49

*could* consult with those, like Lucas, who *subsequently* sent written requests for consultation, it was not required to do so. (Guidelines, § 15086, subd. (b).) Accordingly, the County did not fail to proceed as required by CEQA by not consulting with Lucas.

Appellants next point out that "Ms. Lucas submitted a Draft EIR comment letter (AR 2537-38) and a Final EIR comment letter (AR 16378-16384)" and "personally appeared during the December 2023 Planning Commission hearing (AR 11387-91) as well as the Board of Supervisors meeting in January 2024 (AR 11469-71)." There is no limitation on a tribe's ability "to submit information to the lead agency regarding the significance of the tribal cultural resources, the significance of the project's impact on tribal cultural resources, or any appropriate measures to mitigate the impact," but the agency is not required to incorporate changes or additions to the project as a result. (§ 21080.3.2, subd. (c)(1), (2).)

There is no question that, just as with other areas of concern, the agency shall consider comments received on a draft EIR within the public review period and "shall prepare a written response" describing "the disposition of each significant environmental issue that is raised by commenters." (§ 21091, subd. (d)(1), (2); Guidelines § 15088.) But although Appellants and Lucas identified potential TCRs, they did not clarify the "substantial adverse change in the significance of a tribal cultural resource" (§ 21084.2), if any, the Project will have on these resources or propose any mitigation measures. In other words, they did not raise significant environmental issues.

For example, Lucas listed the Southeast Lake Cahuilla Active Volcanic Cultural District and said it overlaps portions of the proposed project area,

50

but she did not explain what that District is, how it is used, or how its significance would be adversely affected.

She also stated that the Project would "have effects" on Mullet Island and "the (new) mud pots," which she describes as "important areas to tribes for medicine and training" but did not say what effects. Neither Mullett Island nor the mud pots appear to actually be within the Project area, although they are nearby. And again, absent an explanation of the adverse effects, CTR could not know how to mitigate them, even if it was required to do so.

Although Lucas's comment letter mentions the DEIR's lack of tribal monitors and involvement of tribes in evaluating resources, she did not specifically request these things on behalf of her tribe. Notably, the only overt request for monitors was made roughly seven years earlier by the Morongo Band of Mission Indians, but they requested monitoring by a Cahuilla representative during construction activities for the Exploratory Well project, and the Cahuilla then stated that the project area for the well was beyond their traditional use area. Accordingly, the County did not fail to proceed in a manner required by CEQA by not including responses to these comments.

Appellants also do not challenge the threshold of significance used for measuring the Project's impact. The FEIR views an impact as significant if, among other things, it "[c]ause[s] a substantial adverse change in the significance of a tribal cultural resource, defined in Public Resources Code Section 21074 as either a site, feature, place, cultural landscape that is geographically defined in terms of the size and scope of the landscape, sacred place or object with cultural value to a California Native American tribe . . . ." To the extent Lucas identified tribal cultural resources, neither she nor

51

Appellants in their briefing explain how the Project would cause a substantial adverse change to their significance. Absent such a showing, they did not reach the threshold of significance. And if the impacts were not significant (or even described), the EIR did not need to include mitigation measures or alternatives.

Appellants' final contention is that the County did not engage in meaningful consultation with the Quechan, the Torres-Martinez Desert Cahuilla Tribe, and the Morongo Band of Mission Indians. As only the Quechan requested formal consultation, we limit our review to that tribe. In their opening brief, Appellants identify only the testimony of Quechan tribe member, Scott, at the board of supervisors' hearing. At that hearing, Scott did not identify any particular TCRs and did not request mitigation measures or any proposed alternatives. Rather, he expressed concern generally that the consultation was inadequate and that "significant tribal cultural resource concerns have gone unaddressed." Appellants belatedly argue in their reply brief that the project discussed in the 2021–2022 Cultural Resources Survey was smaller than later depictions in the EIR and that Scott identified the visual impact the Project would have on the view from Mullet Island. But again, they do not identify a substantial adverse change in the *significance* of a tribal cultural resource. It is not clear why Mullet Island is culturally significant, whether the view from it is in any way related to that significance, and whether the Project's adverse impact, if any, would be substantial.

The minutes from the May 2022 consultation indicate the meeting ended with the historic preservation officer for the tribe requesting "copies of the prior meeting notes and the cultural resources report so that the Quechan [could] discuss the Project internally, and bring their concerns and opinions

52

to the County after they ha[d] deliberated." An email from five days later indicates the 2017 and 2022 meeting notes were sent along with project maps and the PowerPoint presentation used during the May 2022 meeting. The email indicates the final cultural resources report would be sent once it was completed. Appellants do not point to any follow up by the Quechan highlighting concerns or proposing mitigation measures, and we have found none. Although Appellants object in their briefing that the mitigation measures do not include tribal monitors during all construction and earth-moving activities, they do not direct the court to where the Quechan requested such monitors.

On this record, we need not evaluate whether we agree with the court's conclusion in *Koi Nation of Northern California v. City of Clearlake* (2025) 109 Cal.App.5th 815 (*Koi Nation*), that "consultation means the '*meaningful* and timely process of seeking, discussing, and considering carefully the views of others, in a manner that is cognizant of all parties' cultural values and, where feasible, seeking agreement.'" (*Id.* at p. 840, citing Gov. Code, § 65352.4, italics added.) In *Koi*, the tribe requested two specific mitigation measures, and the record did not reflect that the city discussed its reasons for rejecting them with the tribe. (*Ibid.*) Here, by contrast, the County met with the Quechan, provided requested materials, and afforded them an opportunity to raise additional concerns. That the tribe seemingly did not do so does not make the consultation inadequate.[27]

---

[27] Appellants request that we take judicial notice of the California Attorney General's amicus curiae brief in support of Koi Nation. Putting aside whether this document is an appropriate subject for judicial notice, we need not consider it as we do not have grounds here to evaluate whether the consultation was sufficiently meaningful. Thus, the September 11, 2025 request for judicial notice is denied as to Exhibit B.

53

A consultation may be considered concluded when "[t]he parties agree to measures to mitigate or avoid a significant effect, if a significant effect exists, on a tribal cultural resource." (§ 21080.3.2, subd. (b)(1).) As the record does not disclose that the Quechan responded and identified any significant effects, the County could reasonably conclude the consultation had concluded.

## F. Cumulative Project Impacts to Water Supplies, Air Quality, and TCRs

Appellants' heading for its final contention suggests that the EIR fell short by failing to consider the cumulative impact of the Project on water supplies, air quality, and TCRs. In fact, the argument simply reiterates its prior claim that the EIR failed to consider the impacts of the BHER projects, the LV Specific Plan, and the future phases of CTR's plan for Hell's Kitchen. To the extent Appellants sought to assert the EIR was required to include the cumulative impact of these projects in addition to the Project's impacts on air quality and TCRs, as opposed to just water supply, they do not support their contentions with any additional facts. Therefore, we conclude they have not met their burden to demonstrate reversal is warranted.

## IV. DISPOSITION

We reverse the order in part and remand to the superior court with directions to vacate its denial of the petition for writ of mandate and to enter a new order granting in part the petition for writ of mandate consistent with the views expressed in this opinion. Such order shall include only those mandates necessary to achieve compliance with CEQA in accord with this opinion. (§ 21168.9, subd. (b).)

54

In all other respects the judgment is affirmed.  Parties to bear their own costs.

KELETY, J.

WE CONCUR:

O'ROURKE, Acting P. J.

DO, J.